## DR. W. S. NASH v. MRS. DORA M. MITCHELL.
### and
## DR. W. S. NASH v. EDWARD L. MITCHELL.

Eastern Section. September 3, 1927.

Petition for Certiorari denied by Supreme Court, February 4, 1928.

Hugh M. Tate, of Knoxville, for plaintiff in error.
Steinmetz & Lowe, of Knoxville, for defendant in error.

SNODGRASS, J.  These two cases were consolidated and heard together.  The declarations are somewhat verbose and argumentative, but we consider both declarations as predicating a liability

for breach of contract of guaranty as to results of an operation, and the negligent inattention thereafter as an incident aggravating the damages, and as combining to produce the results complained of.

It is substantially averred in both declarations that Dora M. Mitchell, the plaintiff below, was upon false assurances persuaded to be operated upon on the 7th day of April, 1923, for the purpose of having the muscles in the left leg stretched to relieve her only of a slight limp in walking, which it was averred operated more as an offense against appearances than aything else; that she was assured by Dr. Nash that this could be done easily and quickly, whereby she would be enabled to walk normally in two or three days and that there would follow no bad results as an aftermath; that she was guaranteed that if he should do her no benefit by the operation he would do her no harm.

After reciting the history of the trouble in her left leg or ankle which led up to his first operation performed several years previously, the declaration continued:

"No further trouble arose from this injury for a period of about eight years, when the plaintiff commenced wearing high heeled shoes, and as a result thereof, as she was advised by the defendant, she had a slight contraction of the muscles in and around her ankle which caused a slight limp or twist in her ankle in walking, which, while scarcely noticeable, and causing no real inconvenience, and no pain whatever, as a matter of pride she was anxious, or to say the least of it, willing, to have it remedied.

"This condition existed from the time she was twenty-one years of age to April 7, 1923, during which time the question of remedying this slight defect was frequently discussed by her and her husband and friends, and occasionally discussed with physicians; and in the early part of April, 1923, in discussing the matter with the defendant, the defendant represented to the plaintiff and her husband that by using an anesthetic and putting the plaintiff on the operating table, he could in a very few minutes stretch this contracted muscle and thus eliminate and remedy the trouble, and he represented and guaranteed to the plaintiff and her husband that the operation would be very slight, of no practical consequence, and would consume only a very few minutes. and that it would be a question of only two or three days until all soreness would be removed and that the plaintiff could walk with no inconvenience, no pain, and that the ankle would be as well as ever and that the trouble would be thus entirely eliminated. In this discussion of the matter and in view of the fact that the plaintiff had had trouble with her ankle bone about eight years previous, as herein stated, she made special in-

quiry of the defendant as to whether or not the process of stretching the muscle might not again cause or set up trouble with the bone; but the defendant positively assured her that it not only would not, but that it could not; and after viewing some X-ray pictures which had been made of her ankle, he assured her that the ankle bone was in perfect condition, and that no trouble could arise from the bone from the stretching of the muscles. The defendant did not advise her, or even intimate to her in any way that it would be necessary, or that he would in fact, rebreak the ankle bone in said operation; and she and her husband both were totally ignorant of the fact that such breaking would be necessary, if in fact it was necessary; and had she been advised that it was necessary, or that the rebreaking of the bone would occur, she would not under any circumstances have consented to the operation for the reason, as before stated, that it gave her no pain and gave her practically no inconvenience and she was at that time, and had for several years been able to perform all her duties as a housewife, and was in fact a stout, healthy and robust woman.

"A few days after this discussion, and relying on these representations, and at the instance and request of the defendant, she was taken to the hospital by him and then and there for a consideration paid him, the defendant placed her on the operating table and under the influence of an anesthetic for the purpose, as she thought, and as her husband thought, of stretching the muscle as he had represented to her he would do; but instead of stretching the muscle and relieving the trouble, as he represented he could and would do, and as he represented he could do and would do with practically no inconvenience or pain to her, and thus make her a perfect ankle, the defendant proceeded to perform some kind of an operation on her ankle, the nature of which she or her husband neither knew at the time, but they discovered to be a rebreaking of the ankle bone, and other things unknown to plaintiff.

"After said operation the defendant caused the plaintiff to be removed from the hospital and taken to her home where she suffered untold physical pain and mental anguish, and notwithstanding the fact that the defendant was frequently called upon to visit her, and treat her ankle and relieve her pain and suffering, he refused to do so and grossly neglected her, claiming that there was nothing the matter with her, for a period of several weeks, at the end of which time, on account of his gross neglect, another physician was called to treat her; and as a result of said operation thus wilfully and wrongfully performed on the plaintiff, and as a result of his after neglect to attend her, trouble again set up in the bone of her ankle, from which she has ever since suffered great physical pain and mental anguish; and in order to try to obtain relief from said

suffering she has been compelled to employ other physicians and have a number of other operations performed on her ankle to try to relieve her suffering and avoid her death; and she is now unable to walk, except on crutches, totally unable to perform her household duties, and is a permanent cripple and permanently disabled, and her left leg on account of said operation is much shorter than the other; and as the direct and proximate result of the wrongful conduct herein set out and alleged, the plaintiff has suffered great physical pain and mental anguish for a period of more than a year, and must continue to suffer, and not only pain and anguish, but physical inconvenience, resulting in total disability, as herein stated, for the remainder of her natural life, and all to her great injury and damage, for all of which the defendant is liable to her.

"Wherefore she sues the defendant for the sum of twenty-five thousand ($25,000) dollars, as damages, and demands a jury to try this case."

The declaration of the husband was practically the same as that of the wife, with such change of phraseology as to state his cause of action, that of the husband for loss of services of the wife and necessary medical expenses to which he was subjected, specifying the amount of damages in the sum of $10,000.

To these declarations there were pleas of not guilty and of the statute of limitations, which latter pleas were confessedly abandoned, and the consolidated causes went to trial before the judge and jury on the pleas of not guilty, when the jury found the issues in favor of the plaintiffs, fixing the wife's damages in the sum of $8,000, and the husband's in the sum of $2300.

It is proper to state that the plea of not guilty would not put in issue the contract of guaranty as alleged, but only the breach or breaches thereof. On the motion for a new trial the court, under the penalty of such new trial, required Mrs. Mitchell to accept a reduction of the jury's verdict to the sum of $750 in her case, and to the sum of $250 in Mr. Mitchell's case. This was accepted under protest, and thereupon the motion for a new trial was overruled and judgment rendered for the amounts thus reduced.

In the order overruling the motion for a new trial the court expressed his opinion or conclusions thereon as follows:

"These cases came on to be further heard before the Honorable A. C. Grimm, Circuit Judge, upon the motions for new trials made by the defendant in these respective cases, as heretofore filed and entered of record at a former day of this term, action upon which was passed by the court until this time. Said motions being considered by the court are disposed of as follows:

"The court is of the opinion that the evidence preponderates in favor of the respective plaintiffs to this extent. That on April 7,

1923, the defendant did more than examine plaintiff Dora Mitchell's diseased limb,—and thereby caused her material increased pain and suffering, which the defendant by the exercise of the requisite degree of care could have alleviated,—and that he failed to do so,—and that plaintiff Ed Mitchell incurred some expense and lost the services of his wife to some extent on that account,—subject to a time limitation of five weeks from and including April 7, 1923,—and the court approves the verdict of the jury touching the facts to this extent.

"The court is of the opinion that the evidence preponderates in favor of the defendant touching the alleged 'guarantee,' the alleged 're-breaking of the bone,' the producing cause of plaintiff Dora Mitchell's physical infirmities on April 7, 1923, and both prior and subsequent thereto, her pain and suffering,—the loss of her services, the expense incurred in her behalf (with the exceptions noted) and to this extent disapproves the verdict of the jury touching the facts.

"The court is of the opinion, and so adjudges, that the thirteenth ground of each of the respective motions for new trials, and the twelfth ground to the limited extent above indicated, are well grounded, and the court sustains the same and directs that new trials be granted in each of these cases unless, in the case of the plaintiff, Dora M. Mitchell, a remittitur of $7,250 is accepted, leaving an amount of $750 for judgment, and unless in the case of Edward L. Mitchell a remittitur of $2050 is accepted, leaving an amount of $250 for judgment.

"And came the respective plaintiffs by attorneys and accepted said remittitur but only under protest, and they respectively excepted to the action of the court in suggesting and requiring said remittitur, or otherwise awarding new trials, and from such action prayed appeals in the nature of writs of error to the next term of the Court of Civil Appeals of the State of Tennessee, to be held at Knoxville, Tennessee, which appeal is granted upon said plaintiffs, or either of them who may care to appeal the case, giving good and sufficient appeal bond as required by statute. Upon application of the respective plaintiffs and for sufficient reasons appearing to the court, the said plaintiffs, or either of them, is allowed thirty days from and after this date in which to file a bill of exceptions in these cases.

"The court is of the opinion, and doth so adjudge, that the other grounds of the respective motions for new trials are not well grounded and the same are overruled. It is, therefore, considered and adjudged and decreed by the court that the plaintiff, Dora M. Mitchell, have and recover of the defendant, W. S. Nash, the sum of $750 and all the costs of the case for which execution is awarded,

and that the plaintiff, Edward L. Mitchell, have and recover of the defendant, W. S. Nash, the sum of $250 and all the costs of the case for which execution is awarded.''

Both sides perfected an appeal to this court, and the plaintiff in error, Dr. Nash, has filed twelve assignments of error. Plaintiffs below, now styled defendants in error, have assigned errors as follows:

"The trial court erred in sustaining the defendant's motion for a new trial, and suggesting said remittitur, and said motion should be overruled and the verdict of the jury sustained because:—

"1. The trial court erred in holding 'that the evidence preponderates in favor of the defendant touching the alleged guarantee, the alleged re-breaking of the bones, the producing cause of the plaintiff, Dora Mitchell's physical infirmities on April 7, 1923, and both prior and subsequent thereto, her pain, and suffering, the loss of her services, and the expenses incurred in her behalf (with the exception noted).'

"2. The trial court erred in attempting to place a five weeks time limit on the liability of the defendant for the consequences of his wrongs incident to the performance of said operation.''

"3. There is no evidence to sustain the action of the court in placing a limit of five weeks on the liability of the defendant, the proof conclusively showing that there was no intervening cause following the defendant's wrong to limit said liability.''

"4. Because the evidence in this case, and the conclusions of the trial court announced in its order sustaining said motion for a new trial, and suggesting said remittitur conclusively shows that said action of the court was obviously not the exercise of a legal discretion, but was a mistake of law, or a capricious or arbitrary conclusion.''

We think upon the foregoing action had by the court upon his being dissatisfied with the verdict of the jury, for the reasons stated by him, he should have granted a new trial, and the cause will have to be reversed and remanded for that purpose.

While there are a number of errors assigned by appellant Dr. Nash, based on the charge of the court, and upon his declination to submit to the jury certain special requests, among others the 12th and 13th grounds of the motion for a new trial were, that

"The evidence in these cases so overwhelmingly preponderates against the verdict of the jury that the trial judge as a thirteenth juror should be and will be dissatisfied with the verdict and should set the same aside" and that

"The respective sizes of the respective verdicts are such as to show by their enormity that the verdicts are the result of prejudice, passion or caprice on the part of the jury and the amounts are not sustained by the testimony."

As indicated, except it is claimed that there is no liability, and in the 11th assignment of error that there is no evidence to support the verdict, and that the court should have dismissed the case on the motion for peremptory instructions as claimed in the 10th assignment, there is no complaint by the appellant Dr. Nash that the judgment is still excessive. His 13th assignment of error is, however, to the effect that the court, being dissatisfied with the verdict on the main questions, should have granted a new trial.

We think this latter contention is a sound one. Cumberland Telephone & Telegraph Co. v. T. N. Smithwick, et al., 112 Tenn., 463; Spoke & Handle Co. v. Thomas, 114 Tenn., 458. In the first case mentioned it cites a large number of cases sustaining the rule. It was said:

"The rule in civil cases is that, if the Circuit Judge is dissatisfied with the verdict of the jury, it is his duty to set it aside and grant a new trial, and that upon its being made to appear to this court from statements made by the Circuit Judge in passing upon the motion for a new trial that he was really not satisfied with the verdict, it became the duty of this court when it has acquired jurisdiction of the case, to do what the Circuit Judge should have done; that is, to grant a new trial on the ground of the dissatisfaction of that judicial officer with the verdict."

In the second case mentioned, notwithstanding the court held upon such assignment that there was no evidence to support the verdict in the court below, they said:

"Independent of this ground for reversal, we would feel bound to set aside the judgment and remand the case because of a failure in the court below to apply a well-settled rule which should control the Circuit Judge in disposing of a motion for a new trial where the ground is, as in the present case, that the verdict of the jury is against the weight of the testimony. When this ground was pressed upon the trial judge, he overruled the motion because he found, as stated by him, some evidence to support the verdict. In other words, he applied the rule enforced in common-law actions in all appellate courts—that, when the judgment of the lower court is challenged upon the ground that the verdict is without evidence to support it, the objection will be overruled when the court of last resort finds some material testimony in the record upon which the finding of the jury can rest. This rule has been adopted from the consideration that the trial judge has heard the testimony submitted in the course of the trial, has seen the demeanor of the witnesses,

and upon the motion for a new trial has carefully reviewed the case and come to the conclusion that the jury were warranted, by a preponderance of the evidence, in reaching their verdict. Unless this duty is performed by the trial judge it will be readily seen that great injustice may be done to an unsuccessful but worthy litigant. The appellate court, by long established rule, is shut off from an examination as to the credibility of witnesses and from a weighing of the testimony in order to see where the right is upon an issue of fact; and, if this service is not rendered by the trial judge, then irremediable wrong may result. The necessity for the discharge of this duty by the lower courts has been frequently emphasized by opinions delivered by this court, and the philosophy of the rule which gives so much sanction to the judgment of these courts has been recently stated in an opinion delivered by Neil, J., in the case of Cumberland Telephone & Telegraph Co. v. Smithwick, 4 Cates 463, 79 S. W., 803.''

The declaration as we view it, and this applies to both declarations, made the case of an unauthorized operation, in which broken bone and other unknown results, it was alleged, with the lack of attention thereafter, conspired to produce not only pain and suffering, but a permanent injury, resulting in a shortening of the leg and practically in the loss of its effective use. It was not within the province of the court to reduce the damages upon the basis of not agreeing with the jury upon an issue in the case which permitted the consideration of a larger measure of damages, and to dispose of the case upon a minor predication which may have involved a consideration of exemplary damages, for this was to take the case from the jury and practically try the same himself. If this practice was allowable it would mean that, notwithstanding there was proof that would sustain a verdict on an issue of guarantee, the parties could be deprived of a jury trial upon the larger issue altogether. If there was no proof to sustain the issues of guarantee alleged in the declaration, then he should have dismissed the case on the original motion made for a directed verdict, for that is the only issue we think presented by the declaration. At any rate it was the right of the parties to have the jury pass upon the whole declaration, if there was any evidence to sustain it, which is defeated if, notwithstanding there is some proof to sustain the whole complaint, the court can determine the case upon a fraction thereof, and that, too, not divisibly made by the declaration.

This case is not predicated upon any lack of capacity in the physician or intelligent performance of any authorized operation, but upon an operation in violation of the contract, producing results guaranteed against under the contract, and assigning negligent inattention thereafter as combining to produce the result. For

this reason the court was not in error we think in giving the charge set out in the first assignment, because it failed to take into consideration the question as to whether or not the breaking of said ankle bone took place in the performance of an authorized operation, performed with the highest degree of skill, ability and caution. This was beside the case.

There was no error in refusing to submit to the jury the specification set out in the second assignment, simply because there was no proof calling for it, and if there was it was sufficiently covered in the general charge. Plaintiffs were not required to exhaust all the evidence that might have been available to them, nor does it appear that they suffered or withheld any evidence peculiarly within their knowledge. It is shown that defendant Nash knew of the X-ray made by or in the possession of Dr. Boies before the trial ended, and no application was made to continue the case for an opportunity to make it available. Besides other testimony was to the effect that long before that Dr. Nash knew of this X-ray, and was invited by Dr. Boies to inspect it. There is therefore no merit in the second assignment.

In view of the allegation of the declaration making the failure to attend and give medical treatment one of the combining causes of the injuries, the court should have given the specification in the third assignment of error in charge, and his failure to do so under the circumstances was calculated to be prejudicial.

The court was not in error in refusing to give the request set out in the fourth assignment. The general charge had already covered this matter sufficiently, and to have again presented it in the manner and form requested would have been to unduly emphasize the matter, obscurely and perhaps inaccurately presented.

It matters not that words importing a guarantee may have been used in a loose and nontechnical manner. If there were such as imported a guarantee, and were accepted as such, one may not be allowed to say, after irrevocable action based thereon, that they were actually not intended to have such import. Under such circumstances a man must be held to have intended what was the fair and natural import of his words.

The fifth request set out in the fifth assignment was sufficiently covered in the general charge. However, the facts of this case did not call for its being given to the jury, and it was therefore immaterial. No question is made as to the lack of skill or ability of the defendant Dr. Nash, but only as to the performance of an unauthorized operation with bad results against his guarantee.

The same is true of the request covered by the sixth assignment. In the absence of a guaranty as to results plaintiffs would fail under their declaration.

Likewise of the seventh assignment, which sets out a similar request. If a guarantee was made that no evil results should or would follow an operation, and such does follow the operation, it is no defense that the operation was performed skilfully. Indeed the Doctor says he performed no operation; that he only used a gentle diagnostic massage and, finding the foot afflicted with partial ankylosis, he judged it unwise to proceed further. He described the operation as follows:

"A. Her trouble, you will remember, her condition, you will remember, the chief symptoms you will remember was her foot and that she could not lift her toe on this foot as high as she wanted to—that there seemed to be a contraction of the Tendo Achilles behind and when she was put under the anaesthetic I laid my hands, after having sterilized them with coco butter, I put one hand on her leg here and the other below here on her toes beneath the foot, and I made an attempt in extension to further over-extend the foot. You gentlemen understand that to be flexion—it is not true—flexion is bending the foot around like that, holding the hands on the limb. I made an effort at further over-extension to see if I could overcome the difficulty she experienced, the hitch in her ankle with this hand this way (indicating), and I could not do it, I found it could not be done with just the little amount or traction or an ordinary amount of force that was put on. I then took my hands and rubbed her foot this way freely and asked them to give me some cotton and a starch bandage, and they gave me some cotton and a starch bandage and I put the cotton about her leg, and a rough starch bandage on her leg from just below her ankle down to her toes, but not including the big toe and the toe next to it,—for this reason that when you put these bandages on anybody's leg, as the starch bandage dries, the starch bandage shrinks. It was further held out by a cotton bandage, the starch bandage, so you will have something for the bandage to shrink on—that was done, the bandage was put on there and it dries, and in course of time it shrinks some as it dries. The two toes were left out so you could see that the strain was not too great—you do not want to choke off the circulation and you watch to see the toes, that they do not get cold—that would show that your bandage, your cast or starch bandage would show it was put on too tight. This was put on her leg in a very brief space of time and she was sent out of the operating room and sent to her own room."

"Q. Now, Doctor, in your effort to find out whether it was better to manipulate and extend this Tendo Achilles would be about the amount of time you have used to show the court

or jury? A. I would not put that amount of time on it—not half that much time as I have taken in the time to explain to you gentlemen.''

''Q. Now, when you discovered that it could not be done by that amount of force, what did you announce, what did you do? A. I announced and put upon the chart that she had partial ankylosis, not complete, but partial ankylosis,—the same motion in the joint as the X-ray pictures show, some motion there, but incomplete motion. I then and there concluded that she had a pre-existing disease there that had been there for sometime and that this hitch in her walk that she has complained of for some considerable time was the return of her old trouble.''

''Q. Now, Doctor, from your many years experience and training and practice of your profession, are you now able to say, and were you able to say after making that diagnostic massage what the trouble with Mrs. Mitchell all along was? A. The trouble with Mrs. Mitchell all along has been, from the very beginning, tuberculosis of the bone, called ordinarily osteomyelitis.

''Q. Had that resulted in the partial ankylosis you described? A. It had; that was one of the processes of the disease that took place, and that is the thing that brought upon the partial ankylosis, was tuberculosis of the bone.

''Q. Did you in any way break up that partial ankylosis? A. I did not.''

Recurring again to the subject, he was asked:,

''Q. . . . Now, Doctor, compare the force you used in making this diagnosis by means of massage with the force you have used in treating contracted tendons on other people, even in cases of year-old babies? A. The force that was used with Mrs. Mitchell was very, very much less than I would use on an ordinary person under like circumstances. Measuring it with an ordinary case I would not say that I put one-fifth as much force—used one-fifth as much force as I would put on ordinarily, and my reason for that was this—that I had operated on her many years ago and I knew from her condition that I did not want to do anything that would be likely to give her any trouble at all, and I used every precaution to see that no trouble should arise.''

Mrs. Ethel Chadwell, who at the time of this operation called by Dr. Nash a diagnostic massage, was present. She was then Miss Ethel Rice, a nurse in her graduating year. She says she was in the operating room to assist. When Mrs. Mitchell was brought in Dr. Rogers put her to sleep; that Dr. Nash asked for some coco

butter and she gave it to him; that he rubbed it on his hands, and then he went on to massage, and that he said: "I find"—She was not allowed to finish this sentence, but in response to the direction of the court to let her tell just what he did or did not do, she said: "He took some coco butter and he raised the foot and moved the toe. That is all he done." She described the operation as lasting about a minute, that is, the operation of moving the toe. She stated that the lady was in the operating room altogether about five minutes, both of which statements are manifestly erroneous. She stated that Dr. Nash did not use enough force to stretch the tendon or to break up any ankylosis there was in the ankle; that a two-year old child would be able to stand the amount of force he used on the foot; that he quit right after the effort to move the toe; that the Doctor said it was "osteomyelitis, and nothing could be done;" that the meaning of the term was a tubercular condition of the bone. She said the Doctor did not break up any ankylosis that was there, nor any adhesions. She said that she was now married and had not engaged in any nursing since her marriage; that she had no connection with Dr. Nash and was not related to him. On cross-examination she stated that the nurse in the operating room usually made the operation reports; that she did not know in whose handwriting the operation report in this case was; that it was not hers; that the signature W. S. Nash to form No. 4, exhibit No. 3 to the testimony of Mrs. Black, was in Dr. Nash's handwriting.

Dr. Olin Rogers administered the anaesthetic. He said he saw what was done on the occasion. His position was at head of patient, looking down at foot. He said it took ten to twelve minutes to put her to sleep; was in there about five minutes after putting her to sleep; that Dr. Nash did not have his hands on the foot of the patient many seconds, that he should think something like a moment. He was asked:

"Q. Tell the jury just what the Doctor did on that occasion? A. Well, the only thing I saw him do was to take hold of her ankle here, of the foot in this position, (indicating) and work it like that two or three times, and then after having it between his hands he said: 'This is ankylosis.' I cannot do any anything with it.

"Q. What did he put on his hands then? A. I do not know about that.

"Q. You don't know? A. No.

"Q. Have you seen other efforts made to find out whether the Tendo of the Achilles can be broken? A. Yes.

"Q. I should say stretched? A. Yes, I have seen Dr. Patterson.—

"Q. How would the force used by Dr. Nash compare with the force used when you are really trying to stretch that Tendon of Achilles? A. Nothing to compare with it, not nearly so much.

"Q. Would the force he used on that occasion have stretched the Tendon of the Achilles? A. No.

"Q. Would it have broken up any ankylosis? A. No.

"Q. Did it break it up on that occasion? A. I don't think so.

"Q. When he ascertained that it would not yield to the kind of force that you have told the jury he used, what did he do? A. He asked for a starched bandage, and put a starched bandage on it and sent the patient to her room.

"Q. You have referred to Dr. Patterson; he is an expert bone doctor here? A. Yes, an orthopedic surgeon.

"Q. How did the force which Dr. Nash used compare with that used even in a small child where you wanted to stretch the Tendo Achilles? A. Nothing to compare with it, very much less."

He said he was not associated with Dr. Nash and had no interest in the lawsuit. He testified that the reports were made up usually by the nurse in charge, that they called the senior nurse; that sometimes he had written them up; sometimes the Doctor himself did it; it would be the nurse or one of the doctors in the operating room; that the doctor who did the work signed it, and if it is not correct he is not supposed to sign it.

On the other hand Mrs. Mitchell was asked:

"Q. When did you recover consciousness in the hospital? A. I began to get wakened up in a few minutes.

"Q. How did you feel when you recovered? A. Suffering awfully, with my ankle paining me, and I said, what has he done to my ankle?

"Q. Was Dr. Nash there? A. In a few minutes he came down there, and he came in, and he kind of laughed, and he said: 'I twisted it all around and broke it all to pieces.' He said: 'Well, Dora, I had wonderful results, much better results than I thought I was going to have. I stretched it twenty per cent. You are going to walk fine.' And he said: 'When you go home, take this exercise on your toes.' He said 'Tomorrow you can start to walk.' And he said: 'You are going to be fine, and I had much better results than I thought.'

"Q. Did you leave the hospital that day? A. He told me to go home that afternoon. I said: 'Dr. Nash, I am suffering awful,' and he said: 'You will.' Dr. Nash said, 'I stretched every muscle in your foot.' She said that she went home that

(Saturday) afternoon; that she rolled and tossed from the time they took her home; that she did not sleep any Saturday night nor Sunday; was in torment, suffering awfully; was crazy with pain; that her husband went to her sister's to telephone Dr. Nash, but Dr. Nash did not come on Sunday; that her sister brought capsules which she took, but did not relieve her; that she did not feel any better on Monday; that the plaster was cut down in front by her sister on Sunday; that on Monday Dr. Nash came and finished taking off the cast; that she complained her foot was sore they had to lift her from one position to another. She was asked:

"Q. How did it look? A. Well, it looked, after they took the cast off, it was just all purple, and red streaks run up in here, and it was discolored."

Asked if she could stand on it, she said:

"No, goodness no; I could not stand to walk across the floor."

"Q. Did Dr. Nash come Tuesday, the next day? A. Monday when he came; he came up to my bed, and I said: 'Oh Dr. Nash I am suffering awful! What did you do to my ankle?' And he said: 'Well, Dora, I just twisted it around and broke it up good.' And he said, 'You are going to walk perfect.' 'Now,' he said, 'I stretched it twenty per cent.' He told me again, he said that he had fine results, that it was just a little sorer than he thought it was going to be; and he said: 'You will be all right in a day or two. Get up tomorrow morning and try to walk on that ankle; walk a few steps each day;' that Dr. Nash gave her no medicine, and that he came again on Thursday; that she was still feeling awful; that she had not been free from pain since he stretched the muscle. She testified that he never came again. However, he says the reason was she had got another doctor. She said her ankle never improved; stayed about the same. They sent for Dr. Boies. She said Dr. Boies came in about three weeks after Nash had stretched the muscle."

It is not necessary here and now to examine the testimony of Dr. Boies. Suffice it to say that, after a number of operations, she was never able to walk on that foot again, and is now so crippled for life, though she testified that before what took place in the hospital she had walked successfully on it, doing her housework, and felt no pain.

As to what occurred at the hospital on April 7th, Mr. Mitchell testified:

"Q. When your wife came out of the operating room, where was she taken? A. Taken back across the sun corridor and into the old Lincoln Memorial.

"Q. Did you see Dr. Nash then? A. Yes, at the door of the operating room.

"Q. Did you talk to him there, and if so what did he tell you? A. I said: 'Doctor, what luck did you have?' And he said: 'I have had all the luck in the world.' He said: 'I stretched the thing an inch in the arch,' and motioned this way, and this way (Indicating). He said his wife when she left the operating room began to recupe, and her limb was in a plaster cast from above the knee to the foot here, with one or two of the small toes of the foot he thought sticking out; that she was taken home that night in a taxicab and had never walked since; that in some few minutes after they brought his wife from the operating room Dr. Nash stepped into the room, and his wife said to him: 'What have you done to me,' and he laughed and said: 'I twisted that all to pieces, and you are in fine condition;' and then he said, 'I stretched it twenty per cent;' that he said, 'she can get up Monday morning and go right ahead.' And he then showed her an exercise, and said: 'When you get up Monday morning, do this on your toes.' "

She was numerously corroborated as to the condition of the ankle thereafter and as to what followed. In addition to this the hospital records as to the case signed by Dr. Nash corroborated these statements, that he performed this operation by stretching the Achilles Tendon, notwithstanding the record of the pre-examination indicates that he knew of the presence of ankylosis, or partial ankylosis, which was confirmed by the operation, and Form No. 4 filed as Exhibit No. 3 to the testimony of Miss Black, as this record signed by the Doctor under the heading "What was done," "forcibly massaging ankle, thereby breaking up adhesions in joint." It is true this testimony was sought to be minimized as unimportant formal statements not necessarily accurate, but as Dr. Rogers said "if it is not correct, he is not supposed to sign it." And when it is still further corroborated by the speaking incidents of the extensive bandaging and after appearance and condition of the leg, to say the least of it the jury was authorized to conclude that he performed the operation that had been talked about, and which it is claimed he said was only necessary to secure good results, while poohpoohing any question of ankylosis or other condition which might endanger a bad aftermath. It is also true he denied that there was any guarantees as to results in any form. On the other hand there is proof that there was such guarantee, and certainly such proof as should have been submitted to the jury on the question; and the assignment that there is no proof to support the verdict, and that therefore the court should have dismissed the case, is overruled.

We have not stated all the evidence bearing upon these issues and have refrained from discussing the evidence extensively, but have referred to the same for the purpose of illustrating the issues and proof thereon as showing that the court was not in error in refusing to dismiss the case on the motion for peremptory instructions, but was in error in showing a dissatisfaction with their finding on the main issues of the case and himself deciding it on a minor issue, when he should have granted a new trial.

As the case will have to be reversed for the causes indicated we do not deem it necessary to pass upon the questions raised as to the misconduct of the jury, further than to say: While it is fundamental that the jury must try the case alone upon the evidence introduced on the trial and, that if any juror has learned anything about the case otherwise than through the medium of the trial when it was being presented to them, he should not consider it in making up the verdict; and also that it would be highly improper to communicate it to his fellow jurors; yet this relates to matters concerning the trial, such as would be regarded as evidence bearing on the case, and not to opinions as to witnesses, and not as to any whispered suggestion as to what he expected a witness to say during the trial, or even a remark as to how the evidence was affecting him while it was in progress, or as to the relation of incidents not necessarily intended to or bearing on the case in point, but as regards all the matters insisted upon and most serious is the statement as to the alleged wealth of Dr. Nash. His wealth or alleged wealth is immaterial except upon the question of the administration of exemplary damages; and while the declaration if sufficiently proved might have made out a case for the ministry of such jurisdiction by the jury, in their discretion, making the financial condition of the defendant a proper subject of inquiry, yet nothing seems to have been offered upon the subject while the evidence was being presented, making any such testimony improper to have been considered by the jury afterwards in their deliberations, where the opportunity of disproving it was lost. At least in the next trial the danger of the improper consideration of matters not introduced on the hearing can be guarded against by instruction to that effect. While it is not essential that they be thus instructed, abundant caution sometimes saves a situation from a needless embarrassment.

Regarding the assignments of the plaintiffs below, while the trial court may have erred in finding that the evidence preponderated in favor of the defendant below touching the alleged guarantee, a matter which we cannot and do not undertake to determine, the error consisted in not granting a new trial, and could not possibly in the circumstances of this case justify restoration and affirmance

of the original verdicts of the jury. The assignments. are therefore all immaterial, and are overruled.

For the reasons indicated the cause is reversed and remanded for a new trial. Dr. Nash and his sureties will pay one-half the costs of this court, and the plaintiffs below the other one-half. The costs below will abide the determination of the court below.

Portrum and Thompson, JJ., concur.